15-1080, John Flannery v. the FCC and 15-1117, James Hopkins v. the FCC. Good morning, Your Honors. Mr. Silvia. Yes, for James D. Hopkins. May I ask the Court for two minutes of rebuttal, please? Yes, you may have that. Thank you. So I want to address two points. The Commission's findings on materiality and scienter. Both of those findings are not supported by substantial evidence. On the contrary, when looking at the complete evidentiary record, a contrary conclusion is warranted that there is no finding of materiality with respect to the one issue in the case, which is what's been referred to as the typical slide, and with respect to scienter, with respect to Mr. Hopkins' state of mind. Why don't we start with scienter? Sure, Your Honor. I'll start with scienter. The two are linked, as this Court has recognized in the Waters decision, and some of that guides the scienter, and these errors for materiality overlap into the scienter analysis. First point, the Commission does not contend that Mr. Hopkins intended to mislead anyone. Such a conclusion would be against the weight of all of the evidence developed in the record below, evidence regarding Mr. Hopkins' character, credibility findings of the ALJ, the lack of any motive, and repeated instances in the record of Mr. Hopkins providing accurate information about the limited duration bond fund to investors when asked. Instead, what the Commission concluded is that Mr. Hopkins must have known that the typical slide would mislead investors and recklessly disregarded that fact. But a finding of recklessness requires much more than a showing of even negligent conduct or even extreme negligence. As this Court held in the Grebel case, recklessness requires proof that the omitted information was highly unreasonable, amounting to an extreme departure from the standards of ordinary care and which presents a danger of misleading buyers or sellers that either was known to the defendant or so obvious that the actor must have been aware of it. That is a high bar. Well, the SEC does have here at least one investor who says, I thought the information was material, and I felt a little bit misled that I wasn't told the actual information as of the time that corresponded with the typical information chart. Yes, Your Honor. Let me address that, and that is Mr. Hammerstein. He was actually not an investor. He was a consultant to an investor at National Jewish Medical Center, and the record showed that Mr. Hammerstein, prior to the meeting in question, which is November 10, 2007, never asked anyone at State Street concerning the allocation of various sectors in the limited duration bond fund. The record shows, and certainly the division contended below, that one of the items distributed to investors by State Street were these fact sheets, which actually disclosed the actual sector allocations on a quarterly basis. We introduced evidence, including e-mails right to Mr. Hammerstein, identifying to him the fact where access could be had to information on Client's Corner website and Consultant's Corner website where information concerning portfolio holdings was available. That's why I said that the scienter was linked to the materiality analysis, because what the commission did was look at the materiality in a vacuum. What they did, and it's clear from looking at their brief, is that they looked at the information as being material because they found that it altered the risk profile of the fund. And they relied on one precedential case, Fundamental Portfolio Advisors, and that was a case where the commission did conclude that there was a change in risk. Now, what has happened here is the distinction was between what the typical portfolio allocation, when the slide was shown, and what is contended to be the actual allocation. Knowing what the allocation of asset-backed securities in the portfolio tells you nothing about risk. It is a generic moniker, and it could include a variety of securities, from mortgage-backed securities, securities backed by credit cards, student loans, auto loans. And in fact, just looking at what something is, AVS tells you nothing about risk at all. And in fact, what was in the record, to the extent that Mr. Hammerstein contended that he was concerned about risk, that also was addressed in the typical slide accurately. It identified the ratings of the various holdings in the fund, and that was what was important for risk, whether they were AAA or AA-rated securities. That is what somebody looks at to decide what is the risk of this portfolio. If I look at AVS, I don't know whether that contains a BBB AVS or AAA AVS. There would be no way to make a determination of risk based upon that. And that's why I say that that's important to show that the materiality analysis was flawed. And when you take that materiality analysis over to Scienter, when looking at Mr. Hopkins' state of mind, to mislead. No one would think that somebody who is listening to a presentation regarding why the fund underperformed, specifically directed to a BBB holding, would conclude from a slide that didn't say anything misleading about risk. There seems to be a sort of theme to the SEC's brief, which I'm not certain how it's connected to the findings against your particular client. But they suggest that State Street had differing interests here, including that many of State Street's own bond funds had invested in this particular fund, and that State Street was well aware that the market was tanking, and its own internal funds seemed to be making decisions to get out of this fund, while those in the public were deprived of this information. Well, let me just address that, Your Honor. What the undisputed testimony at the trial was, that as of May 10th, 2007, which is the day that the typical slide was alleged to be presented, that nobody at State Street knew that this crisis was coming. The whole reason for the May 10th meeting was just to explain a blip in this BBB ADX, this tranche, and it was believed to be the result of hedge fund activity. There is no testimony in the record that anybody recognized that the crisis that would occur in June and July was something that was going to happen as of May. Certainly, there was no evidence that Mr. Hopkins was aware. And, in fact, we had Eric Seery, our expert, who testified about the development of this crisis, the timing of it. And so whatever the chronology of State Street, what they were telling their investors, there isn't any evidence in the record that anybody was being told as of May to move either out of the limited duration bond fund or that there were any problems with the fund. To the contrary, in the two months prior to May, that BBB ADX problem that had occurred in February actually had rebounded and that the performance of that tranche of the fund had its best performance in those two-month periods. So at the time, there was nothing, there were no storm clouds on the horizon, and the sole purpose of this meeting was just to explain to an investor what had happened to the fund in February. And that was the purpose that Mr. Hopkins was there. He wasn't there to try to sell the limited duration bond fund. In fact, the fund itself was a different fund. It was the Dow Jones Commodities Fund that had the limited duration bond fund as part of the package to develop what's known as sort of the alpha return of that fund. So at the time, there is nothing that Mr. Hopkins could have disclosed. And I think as we pointed out in our briefs, this started when the order instituting proceedings was brought as you didn't disclose about the subprime crisis. You'll notice that in the briefs and I think even in the commission's opinion, there's really no mention of that. It's now turned to, well, you didn't disclose the risk of the balancing of ABS in the portfolio, and it's not even, at least with respect to Mr. Hopkins, about subprime. On the sector breakdown, if it was immaterial, what was the purpose of the breakdown? Immaterial in the sense that it was just more information that was there, and I think as the ALJ held below, it was an exemplar, an example of typical. And the question is typical, what's the horizon? This is a fund that was started in 2002. There is no evidence in the record as to the life of the fund. What is the typical portfolio allocation? The important part of it is what was also on the right-hand side of the typical slide, which shows the breakdown of credits by quality, which is what everybody testified. They wanted to know what the risk of the fund was. How far was the disparity as to allocation at the time of this May 5th meeting? Your Honor, I don't think there was anything introduced in the record as to what the allocation was on the 5th. What was introduced were fact sheets showing the allocation varying, going 60s, 80s. At one point there was an allegation it was 100, and then in June it was 80%. So I don't think as of May 10th there is anything in the record that says what the trading history was. I thought your client typically came into those meetings with a sense of whether there was a disparity between that chart and what the reality was, and that he wrote that information on a piece of paper. Your Honor is correct with respect to other presentations, and the testimony was that to the extent that anybody asked if you saw typical, well, what's the exposure today, he would be able to ask. I thought he didn't just use that information to respond to questions, but that he sometimes affirmatively gave the information. What does the record show? With respect to the presentations themselves, he did not have a recollection with presentations of what he stated, and the division did not call any investors at all to testify about any of these meetings. So, Your Honor, we don't have a record of that. We do have a record of a couple of instances where people asked for breakdowns, specific security-level breakdown, and that was information that Mr. Hopkins provided, which I think really augers against the finding of Scienter. He had no motive to hide anything. He had no interest. He certainly, his reputation was not in any way to withhold information from people. And here, certainly with respect to the fact sheets themselves, the commission had to prove materiality because the ALJ did not make a finding on materiality. And as a result of that, they had to cabin in the total mix of information available, and they didn't do that. They didn't indicate and prove that those fact sheets, which they alleged were distributed to clients, actually were not distributed to anybody at Yanny Partners, not just Mr. Hammerstein, or anybody at National Jewish Medical Center. So they don't even have the record as to what, in fact, was known in the marketplace and part of the total mix. And that's really what goes to the heart of both the materiality and the Scienter. Thank you. Thank you. Thank you. May I reserve two minutes as well? Yes, Mr. Pearlstein. Thank you. I'd like to focus on three issues from our brief. First, the letters themselves as to which Mr. Flannery was charged were accurate. They were not misleading. Secondly, he acted reasonably, and as to both of those findings that the SEC made, inconsistent with the findings of the administrative law judge who tried the case for 11 days, there is no substantial evidence to the contrary. And then third, there's been a complete failure of proof as to the purported materiality of the alleged omissions in the August 14th letter. Let me start with the August 2nd letter. And as to this, the sole suggestion, the sole finding by the SEC is that that letter was allegedly misleading because of a supposed mischaracterization about the effect of the AAA bond sale. What the ALJ found was that that was, as the letter said, an effort to reduce risk. And as the expert testimony in this case and the head of risk management at State Street, Patrick Armstrong testified, and as Mr. Flannery believed, it was a successful effort to reduce risk. The commission focused solely on the fact of its belief that because the fund did not retain all of the cash that resulted from that sale, that somehow the fund was more risky. And in doing so, the commission erred grievously because the reality is it missed the undisputed impact of that sale, which reduced exposure to a rapidly deteriorating asset class and leverage. And I can just give you this example, which will illustrate the risk reduction. On your first point, they sold off a goodly portion of the more valuable assets and left trashier assets remaining. Your Honor, here is what the commission simply ducked in its opinion. In doing so, failed in the task that Universal Camera requires. And it's this. That position, that AAA bond position, was funded by roughly $450 million of investor capital and $1.1 billion of borrowings, of a loan. As the exhibit at page 123 to our addendum indicates, in July 2007, the fund dropped 10%. And as the testimony shows, that drop was the result of this contagion spreading to the higher rated bonds. Had there not been a sale and there had been a subsequent 10% drop in the fund, as it had been in July, the value of that fund and to the investors in that fund would have been reduced by $150 million. That's just simple mathematics. And in terms of the investor capital, which was $450 million, because of the impact of leverage, which amplifies both market movements, positive or negative, 33% of the investor capital would have been wiped away. The fact is, and the commission simply didn't address this at all, the administrative law judge credited that testimony because it quite obviously reduced risk. At a bare minimum, Flannery acted reasonably in believing that that was the case and that that was the impact of the transaction. Didn't they sell a portion of the BBV assets as well? Correct. And in fact, what actually happened, pursuant to the instructions of the investment committee, is that a pro rata slice of the assets were sold. So there are three transactions that took place July, beginning of August, prior to the August 2nd letter. There was a sale of the BBV swaps. There was the total return swaps rolling off on August 1st. And then there was the AAA bond sale. But in addition, pursuant to the investment committee directive, there was a so-called pro rata sale. There was sale of up in time 1.2 billion of the AA bonds and 100 million of the A bonds, such that as the commission has conceded, the credit quality, the credit rating, was not, respectfully, Your Honor, left with trash, but what had been an average AA rating before remained a AA rating later. So the credit quality was not diminished. As to the August 14th letter, it's astonishing that this is characterized as a lulling letter. The very language itself indicates, I mean, uses terms like crisis, magnitude of risk, not previously anticipated, hardly phrases to dupe investors to remain. The many judicious investors' language, the sole basis for the complaint here, was written by a lawyer for State Street, Mark Duggan. Flannery believed it was accurate, but it replaced an opinion that he had expressed with a different opinion that he also believed was accurate, which is that in this storm, when the price, as he testified, when the price of liquidity is so high, many, not all, many judicious investors will choose to remain. It defies logic to think that the institutional investors here could have been misled by that expression of belief that's clearly protected under the Omnicare case. As to the supposed omissions here, two points. One, the commission makes much of the fact that the related funds had taken their distributions in kind, or at least many of them had. It actually corroborates the many judicious investor point, because what it reflects was an unambiguous determination by the related funds that they wanted to maintain exposure to the Lidbiff strategy and the Lidbiff positions. And there is no evidence in the record, not any, after an 11-day trial, to show that the related funds had some other reason for making that choice. Zero. That's number one. Secondly, as to the question about the advisory groups and the related funds and their activities, the evidence is overwhelming that in both the FAQs and then again in the August 6th letter, which went to all of the investors in the limited duration bond fund, those facts were disclosed. Those were known to the investors. Those were part of the total mix of information that was available to the investors. Thank you. Ms. Halvan. Lisa Halvan for the Securities and Exchange Commission. Please speak up more. I want to begin by addressing why substantial evidence supports the Commission's findings here, and then turn, if the Court is interested, to the legal arguments raised by Mr. Flannery. There is no real dispute in this case that there is evidence supporting the Commission's findings against Mr. Hopkins and Mr. Flannery. The dispute is about the Commission's assessment of that evidence and whether it describes the kind of behavior that is prohibited by the securities laws. Well, take the slide. Yes. Is there evidence in the record that the risks posed by ABS versus CMBS versus MBS materially differ from one another? In other words, is there any evidence in the record that a holding in CMBS was a less risky holding than ABS? I didn't see any. No, but, well, I can't speak to the universe of the record, but at the moment nothing comes to mind. If there's no evidence that CMBS is less risky than ABS or MBS is less risky than ABS, then why is it material to an investor whether the ratio is 55-25-10 or 90-5-5? You have three holdings with immaterially different risk profiles. Well, Your Honor, I think the answer to that is that it is a fundamental proposition of investing that investors want to know what they're invested in. Well, sure, everybody wants to know everything, but you've got to prove materiality. And the whole theory here is that this fellow was trying to hide the fact that there were 90% in the ABS rather than the 55% because presumably investors would care. And why would they care about if the risks weren't that different? I mean, sure, they want to know what they have, but I'm not seeing, unless you can show some risk difference, I don't see how you show materiality. Two responses to your question, Your Honor. First, it may be the case here that the credit quality of the underlying assets didn't change substantially depending on the allocation of ABS. In fact, there's no evidence that it changed at all, is there, in this record? Accepting that that's the case, Your Honor, it's still true that what was represented was a diversified portfolio based on the type of investment, that what investors and their consultants like Mr. Hammerstein were shown was a slide that said, here's a diversified portfolio. It is 55% ABS and then allocated as illustrated across the other sectors. And so it may be that some investors would have only wanted to care But it's equally possible that they would have wanted to know what the actual sector allocation was, and that was for investors to choose. So what I hear you saying then is that even if notionally these have identical risks and there's no evidence otherwise, the mere fact of greater diversification would be something someone could be interested in because greater diversification leans in the direction of lower risk. How does that mesh up with your witness's testimony, though, about why he found it material? Did you have one witness of all the investors who heard this, you came forward or whatever with one person who said he thought it was material. Did he say it was because it connoted that the difference between a 55-25 allocation and a 90-10 was material for diversification purposes? He did, yes, Your Honor. He testified that it was important to him to understand what the portfolio was invested in, and I think when you look at the... But that's always true. And if you just said that was enough, then any variance in any description of any portfolio would always be material. Don't you need a little more than that? Did he go forward and offer any explanation why, if he had known that the diversification itself was of value? He explained that, as Your Honor noted, that diversification to him was an indicator of risk in the portfolio. And I think, as I said, even if the underlying credit quality of the assets doesn't change substantially, diversification itself is still something that is important to investors, that they are at least entitled to consider when deciding to remain invested in a portfolio. You've just heard your brother counsel make an argument that this wasn't material because most investors would, in fact, not be looking at allocations but would be looking at the bond ratings. All right. Now let's go back to the standards for Scienter. How can you possibly find that this was knowing recklessness when, in fact, for many investors, this information is irrelevant? I mean, do you have some statement as a matter of law that diversification, even if not material, somehow has to be disclosed? No, Your Honor. I don't have that statement, and I would agree that notions of materiality are built into the Scienter analysis. I think here there is evidence showing that he walked into the meetings with investors knowing that they would be misled about what was in the portfolio. Is that because of the one slide? I'm sorry? Is that because of the one slide? This one slide was misleading. Out of 48 or something like that, a large number, this one slide, which was, I assume, flipped up on a overhead, that that would be sufficient so that everything else which happened would lead to the misleading of that individual investor, the only one who came forward, that you brought forward to say that he was misled? With respect, Your Honor, I'm not sure that whether this is one slide of 48 or one slide of two, whether that makes a difference here. I think it makes a difference when you're looking at the totality of what was presented to the people at the meeting. And here we have evidence. Mr. Hammerstein testified that this slide, the information in this slide was important to him. He testified that it made a difference to him and his colleagues when they worked with their clients. But that wasn't the question. The question was focused on Scienter. Whatever or not he felt, given the general practice in the industry, what's the basis for saying that when you have a meeting about the BBB change and going on and you walk in with 40-something slides, that you're sitting there saying, aha, when they get to page 46 of the slide, I've got a figure there under typical that's high, and that I should know that because it's diversification. It's reckless not to know that everybody would be interested in that. It seems a stretch. Respectfully, I disagree, Your Honor. He received requests from investors for information in the portfolio as recently as two weeks before this presentation. And he gave accurate information? Yes. And that demonstrates that he understood what was in the portfolio. The fact that he was walking into these meetings with a slide that was misleading on its face when he testified unequivocally that by May 2007, this slide was not an accurate description of the fund, and that in fact as early as 2006 it wasn't typical. But typical at one point in time of the fund. And it also showed that the fund was largely in asset-based securities, if you added them all up. Yes, but Mr. Hopkins testified, and this is at Appendix 843 and 844, that by 2006, 55% was no longer typical for the ABS allocation in the portfolio. Didn't the slide understate the actual cash, the current cash? As of that date, I thought... His handwritten notes say 7% for cash, whereas the chart says 5. And I suppose one could dispute whether that is a materially misleading difference. At issue here, of course, is the 55% versus 80% or 100% discrepancy that was at issue with respect to the ABS investment. Well, but it shows that there was something there that if he was trying to sell this, there was a positive thing about the current that he didn't bother to point out either. Doesn't that just go to the fact that this meeting was not about the market breakdown and no one would have been thinking that that was what it was about? I have a couple of responses. First, the fact that the meeting was about the performance in the BBV ABX index doesn't absolve his responsibility to present accurate information... No, but it bears on whether it's reckless or not to have some other mistake in one of the 40-something pages of the slides. Mr. Hawkins, as the Commission found, had an ongoing responsibility for keeping this particular slide updated. He was responsible for ensuring its accuracy every quarter, and he was periodically asked by client-facing personnel if he wanted to update the slide. So this isn't just an instance of him being confronted with a 50-page deck of slides right before the meeting and hoping that everything in it was accurate. He was familiar with the contents of the slide and for years was responsible for keeping it updated. And here the fact that he consistently elected not to update it, despite knowing consistently what the correct allocation was, is evidence of his yanter. And I just want to reiterate that on substantial evidence review, this Court asks only whether the evidence is sufficient to satisfy a reasonable fact finder. Let me ask you a different question. Let's turn to the August 2 letter. With reference to that letter, what specific... I was having trouble seeing what specific statement in that letter you say is false. I'm assuming it's in the last paragraph, actions taken? Correct. And which sentence is it that's false? I agree, Your Honor, it's not a particular sentence, but if you look at several clauses together in context, that is what the Commission... Okay, so there's no sentence in there that's false. How do I get to falsity, then? The sentence that begins with additionally the downdraft in valuations, that's in the second line, has had a significant impact on the risk profile, prompting us to take steps to seek to reduce risk across the affected portfolios. So you certainly agree it was true that there was a downdraft in valuations that had a significant impact on risk profile. Yes, and so then they were taking steps, they're asserting that they are taking steps to reduce risk across the affected portfolios. And doesn't selling assets reduce risk in converting them to cash? Provided that you retain that cash, yes, and in this case... Well, that's a whole separate issue. You're going to get demands whether or not you sell the assets. In this instance, selling of the assets to the extent it reduced leverage did reduce risk, yes. And selling the BBVs reduced risk, did it not? Selling the BBVs did reduce risk, but they specifically note then in the next sentence, Your Honor, we had sold a significant amount of our AAA-rated cash positions. And that was true, too. That is a true statement. And they were explaining to the investors that's what they did to reduce risk. And we would dispute whether, in fact, the sale of the AAA bonds reduced risk. Do you think going from a AAA bond that is potentially under pressure in the market to cash at a time of a liquidity crisis in the market is not a reduction in risk? If that is all that they were doing, that would have reduced risk. But the very purpose of the sale, as Mr. Flannery himself articulated at the July 25th Investment Committee meeting, was to free up cash to enable redemptions. The purpose of the sale was not to hold onto cash to ensure that the risk profile in the portfolio was reduced. What you seem to be saying is everything here is literally and completely true, but they should have added a sentence that they'd also received demands for cash and had paid out on those demands so that of the AAA assets that they sold, X percent of the cash proceeds is now out the door. It seems to be saying that it's the omission of that that your complaint is. I think that is certainly one way in which they might have made this letter not misleading. The last sentence is also relevant, though. The last sentence states the actions we have taken in LDBF will simultaneously seek to reduce in other fixed income and active strategies. And so the message from that sentence is these steps that we have just enumerated have, in fact, reduced risk. Let me take that. Isn't that true, though? In other words, if they had not taken any of those actions, wouldn't each of those other fixed income strategies be slightly riskier than they were because of the sale of the AAA and the BB bonds that they did? Well, those strategies were allowed to exit LDBF. They were allowed to redeem their shares, so ultimately for those strategies, it did end up being a positive event for them that enabled them to reduce risk. So what's wrong with that sentence, then? I'm confused. Well, in context, when you read all of these sentences together, what this letter represents was we intend to take steps to reduce risk, or we have sought to reduce risk. One of those steps is the sale of the AAA-rated bonds, and that has, in fact, reduced risk. And the commission found otherwise. But wait. If you take don't sell anything, that's scenario one. And then get all your demands for cash, but you haven't sold anything. Scenario two, you sell a bunch of your AAA and you sell a bunch of your BBs. Aren't you, by definition, less risky in scenario two than scenario one? Depending on how one evaluates the risk of those securities, yes, it is entirely possible. But the problem here is that when you enumerate various steps and you say we have taken certain steps, including selling the AAA-rated bonds, what that suggests to the reader, and I want to point out that the commission takes the perspective of an investor reading this, not the perspective of State Street drafting this letter. So from the perspective of an investor, an investor sees this They've increased liquidity. That has reduced risk in the fund. And the reality here, as we know from the discussion at the July 25th Investment Committee meeting, is that's just not what happened. That was never the intent. The intent was never to hold on to the cash in the fund. The entire purpose of the sale was to create liquidity for the up to 50% redemptions they expected from the related internal funds and the internal advisory group clients. So they viewed this as one larger transaction. And I understand the inclination to parse it into this smaller transaction looking only at the sale, but that just wasn't the practical reality here. The liquidity went up, right, between Scenario 1 and Scenario 2? Momentarily, until it was... Well, it wasn't the time this letter went out. The liquidity was higher than if they hadn't sold any of the bonds. As of the moment this letter went out, but as Mr. Flannery well knew, redemptions continued at a precipitous pace until the cash was largely drained from the fund. And, in fact, I think it's incredibly important to remember that the related funds and the internal advisory group clients were deemed not just... It wasn't just a stray redemption or a single fund, but this was all of their assets, or at least virtually all of their assets and all of those funds. So we're not talking about just a little bit of cash coming out, but a lot of it from the internal groups, as Mr. Flannery well knew, based on his attendance and active participation in the July 25th meeting. You know, I'd like to go back to the earlier letter, the August 2nd letter. How do you factor the August 2nd letter into his responsibility, given the fact that he didn't draft it, he didn't sign it, he didn't have anything to do with the revisions which were made, etc.? Yes, there may be, arguably, there are misstatements. I'll take that arguably, but what's his responsibility? Well, Mr. Flannery was the chief investment officer. He sat at the very top of the corporate pyramid. But he didn't do it. Somebody else did it when he was there in the first instance. But as far as the drafting of the letter, the vetting of the letter, the signing of the letter was done by somebody else. Well, respectfully, I would argue that he is part of the vetting of that letter. He received it. He edited it. He did make changes to it, and it's clear that he read it carefully, and particularly given that this letter addressed the events that he had just later, that it addressed the sale of the AAA-rated bonds and the effect on the portfolio. It was incumbent on Mr. Flannery, in a position as chief investment officer, to ensure that investors did not receive misleading information. So his feeling was that he didn't sign the letter, and he didn't have anything to do with its final version. At least there's no evidence that he had anything to do with its final version. Well, he received it, certainly, and had another opportunity to review it. And how was it unreasonable for him to rely on his counsel's advice that less risky wording would be A and not B as he originally drafted it? It's hardly self-evident to me that that phrase caused risk to anyone. Well, as for the first part of your question, Judge Lynch, Mr. Flannery points to the attorneys that were involved and says they were involved, and therefore that should be sufficient. And they provided specific language, which you are now saying was inherently risky. Well, the lawyers testified in this case that they relied on the business executives for the factual statements in the letter. They were not in the business of double-checking statements about the fund and its risk. And so if Mr. Flannery is pointing at the lawyers and saying, I look to them and the lawyers point back to Mr. Flannery and say, we rely on individuals like him for the factual statements, the buck has to stop somewhere. And here the commission reasonably determined that it stops with the chief investment officer when it comes to statements about a fund's risk. All right. If you're caught by surprise by anything that's said during rebuttal, we'll give you time. Okay. Thank you very much. Thank you, Ron. I just wanted to address a question that came up, risk. And I think it is very important looking at it in the context of both materiality and scienter for Mr. Hopkins looking at the risk. And I would just cite the court to Exhibit 73, which was an April 24, 2007 Yanny Partners communique to their clients, and that was three weeks before the May 10th meeting. Interestingly enough is that Mr. Hammerstein is in there saying that he understands that the limited duration bond fund is primarily invested in ABS and MBS at that time. So as far as sort of diversity, he has some different knowledge there. And I think that it is interesting that when we get to May 10th, that if it was so important about the diversification in the typical slide portfolio, you would think there would be some mention of it in the write-up that was prepared by Yanny Partners. That's Exhibit 83, Joint Appendix 2091. There's nothing. There's no mention in the write-up by the report prepared by National Jewish, Exhibit 62, JA4437. And there's no mention of it in the write-up contemporaneously prepared by Mr. Hopkins' colleague. And, in fact, in her write-up at JA4435, she notes that they only had three minutes to present. And that is consistent with Mr. Hopkins' testimony that they got lost on the way there. So you would think that if this was important that it would show up in the risk profile. And, you know, when I asked Mr. Hammerstein about his investment selection, this is on page 20 of our reply brief, he replied that as long as he knew the risk profile, he didn't need to see the holdings. Quote, we based our due diligence procedures on our perception of risk. If you don't want to see the holdings, looking at an allocation will tell you nothing about risk because you don't know whether the ABS is BBB ABS. You don't know whether it's AA. You don't know whether the mortgage-backed security is BBB. You also don't know whether there's any difference between the two because you don't know about the underlying security. So if you're not going to look at the securities to look for diversification, it tells you nothing about risk. And that's why I would submit that that also goes to why Mr. Hopkins did not act with it. Thank you. Thank you. There's absolutely no evidence that the two letters in any way misled an investor, that investors did not know the allegedly omitted information or that any of it would have been material. Unlike the case against Mr. Hopkins, the Division of Enforcement did not call a single investor to the stand. So you're left to speculate as to what the actual impact might have been. And the burden, as the Fan and Shanahan cases illustrate, is on the commission to do just that. There's been a total failure of proof. But there's evidence that deals with the materiality issue. That evidence is in the form of the expert John Peavy, who testified that, in fact, the system that was in place at the time for communicating with investors was reasonable and typical for investors in a collective trust fund such as these institutions, and that it presupposed that investors and their consultants would reach out and contact State Street with questions. And the record is also undisputed that they did that. In fact, they did that in such volume in July 2007 that State Street formed what it called a SWAT team and developed a series of these FAQs to provide answers for the questions that they anticipated investors were going to ask. And those answers included disclosures that Judge Kayada referenced, which is the amount of the redemptions that were taking place by early August of 2007, the related fund redemption activity, and the advisory fund activity. That's the sole evidence in the record on that subject, except that the August 6th letter sent to this same group of investors made precisely the same disclosure about the related funds. And, in fact, LIBIF II, which was announced by the August 6th letter, was premised on the idea that the redemption activity was so high that this fund was being set up to take away daily liquidity. Thank you. Thank you. Counsel, thank you very much. We will take the case under advisement. All rise. This session of the United States Court of Appeals is presented to 930 tomorrow morning. God save the United States of America and this honorable court.